and the West Aurora School District, 129. On behalf of the Avalon, Mr. Patrick C. Doughty, on behalf of the Property Tax Appeal Board, Ms. Valerie Quinn, on behalf of the West Aurora School District, 129, Mr. Joshua Whit. Thank you, Mr. Doughty, for your pursuit. Good morning, Justices. May it please the Court. I'm here today on behalf of the Avalon, in this case Kraft Foods. Kraft Foods is the tenant of an 860,000 square foot industrial building in Aurora, Illinois. Part of its lease is responsible for payment of the taxes, and it has the right to appeal the assessment of its property under the lease. Kraft timely filed appeals with the Kane County Board of Review. Such went to that with the Property Tax Appeal Board. The Property Tax Appeal Board held an evidentiary hearing, heard from three witnesses, and it concluded that when it issued its decision, it came in with a value of $40 million. Can you tell us why de novo review applies in this case? Yes. It applies in this case because, as outlined in our brief, there's a question of law here, which I believe the appellate court gives the appellate court jurisdiction to decide in this case de novo. What PTF did here was they developed their own opinion of value for the subject property. They didn't... I'm sorry, they developed their own, the train whistle was going... They developed their own opinion of value. PTF is an administrative agency. It has the authority to do only what the statutes and its rules give it. They provide only that the PTF is entitled to hear testimony, weigh the evidence, or render a decision. Well, isn't that what they did here? They didn't develop their own methodology, did they? Yes, they did, Your Honor. How did they do that? I mean, we know the three methodologies, sales comparison, income, and cost approach, right? Correct. And that would be, if we were reviewing those, that would be de novo review. How is what the PTAB did a new methodology? Well, this would be the first... I've been appearing in front of the PTAB for the past 30 years. This would be the first time I've ever seen a decision in which they picked and choose from parts of each appraisal and came up with their own independent appraisal of value. Their decision doesn't represent the value finding of either our appraiser or of the intervener's appraiser. Rather, it's the PTAB's own opinion of value. And nowhere are they entitled to develop their own opinion of value. So you're basically... When they did that, they created a question of law because of the methodology PTAB employed. So you're saying they had to take the expert's opinion, one or the other opinion regarding value, either Gibbons or... I'm sorry, I've forgotten the name of the other expert. McCormick would be the second. McCormick, right. Either what McCormick concluded at the very end or what Gibbons concluded. Is that right? The one or the other? Is that what you're saying? Absent some factual errors that PTAB can point to which would impact the value that they select. That was an indication. You're saying PTAB didn't properly weigh the evidence. Isn't that correct? No. I'm saying PTAB came up with their own opinion of value based upon a mix and a match of two different appraisals. Do you have an authority that would support what you've just told us? That they can't... Right. We're calling it mix and match, but Justice Shostak called it weighing the evidence and deciding what part of the evidence from one expert to believe or give more credence to and what part of the other expert's testimony to give more credence to. And perhaps if they had done that, I wouldn't be arguing that it's a de novo standard, but what they did was when they mixed and matched, they made errors in their mixing and matching, which is why I say it's their own appraisal. For instance, in the cost approach, which typically sets the upper limit of value in developing an appraisal, they employed a replacement cost new prepared by Mr. Gibbons. They used Mr. McCormick's reproduction cost new. There are two different methods of developing cost new. Reproduction, you're building the exact same building that exists out there today, which means you're building in certain physical and functional obsolescence. When you employ a replacement cost new, you're excluding certain physical and functional obsolescence because you're building the property to today's standards, not the standards that were in place when the property was constructed. Further, Mr. McCormick's depreciation analysis, reproduction replacement analysis, is based upon his sales caps, which PTAC found either not reliable or less reliable than those employed by Mr. Gibbons. When you do that, you're mixing two different types of approaches to value. You can't possibly get to the right answer. Didn't you specifically ask PTAC to consider Gibbons' comparable sale three to McCormick's comparable sale two? I mean, weren't you asking for those comparisons and comparables? No, we weren't, Your Honor. You never did? No, no appraiser picks one particular comp as the basis for his value opinion on the sales comparison approach because he's weighing all of the comps. His opinion of value on all the approaches, but particularly on the sales comparison approach, is based upon his analysis and his judgment of all the appraisals set forth in his sales comparison approach. They do not pick one individual comp and rely solely upon that. If they were going to do that, they don't need to develop and do all the research that they do, which leads into their conclusion of value. Not only that, but the sales comparison approach is typically supported by both the income and the cost approaches to value. An appraisal is not just a one approach thing. It's a unified document. It consists of three different approaches of value. The reason they do that is because if done right, each approach tends to support the other. If there's a disparity, particularly a large disparity, that's an indication both to the appraiser and to any readers of the report that there is something wrong here. Something has to be further investigated. You don't typically see that in an appraisal. They may vary 5% or 10% either way, and that's the purpose of the reconciliation of the appraiser. He weighs all three approaches to value. He knows which one is stronger versus which one he'll give less weight to, and he concludes to a final opinion of value. Since you're talking about comparables, what do we know about the properties in Joliet and Romeoville? Do we have to just take McCormick's word that they're indeed comparable? Yes. He inspected those properties. He chose those properties. He didn't just go through a book and say, I like this one, I like that one. He chose them for a particular reason, primarily size. At 860,000 square feet, the subject is huge. There is a market for it, but it's a limited market. There aren't a whole lot of potential purchasers out there. When you're comparing locations from greater distance like, for instance, Romeoville and Joliet versus Aurora, don't differences emerge like standard living differences, access to interstates, as we have in this Aurora case, or different access to better schools for workers? Shouldn't that all be taken into consideration as something that PTAP should have the opportunity to make a determination about? Perhaps, but that's something a typical industrial purchaser would take into consideration. In the Chicago metropolitan area, we have people traveling 60, 80 miles a day to and from work for one reason or another. Better schools where they live, they don't want to relocate, they've been transferred, all those reasons. But what an industrial purchaser typically looks at, one, is the building the size I need. Will it serve my particular purpose? And two, in this case, it's more of a distribution center. How close is it to an interstate? But those are the sort of things an industrial purchaser typically takes into consideration. Do we know how close the Romeoville and Joliet properties were to the interstate? No one ever testified to that, did they? No one testified to that, Your Honor. But we did have testimony that the one in Aurora was pretty close to the interstate. They are very close to the interstate. However, the other problem with those sales in Aurora is their lease fee transactions. Given sales one and six, he himself admitted that they were lease fee transactions and he put no weight on them. Didn't he put no weight on them because they were involved in this actual subject property? Does that not matter? No, that wasn't the sole reason. If you have a sale of a subject, there is no better evidence in terms of market value than a sale of a subject. But this one was discounted because the rents weren't market value. And somebody testified that if the rents are market value, then a lease fee transaction can be an indication of market value. Yes. But if the rents aren't market value, then it can't be. I think your expert actually may have testified to that. It was our rebuttal expert that made that testimony. So here, everybody testified that the rents weren't market value on at least number one, which is a subject property. Correct, and number six, which was part of the same bulk transaction. Is that a good reason to just discount those two right off the top? Yes, it is. However, we have three other bulk sales that Mr. Gibbons employed and that PTAB relied upon. And one of them your expert looked at. Correct. So if your expert looked at one of the bulk sales transactions, why can't the other expert look at that? Why can't the court look at that? If he had only looked at one, as our expert had, perhaps he could. But we're looking for a fee simple value here. The sales that occurred in Romeoville and Joliet were fee simple transactions. They were not lease fee transactions. If you don't mind, what is a lease fee bulk sales transaction in layman's terms? Okay. It typically applies to a real estate investment trust transaction. They typically trade properties back and forth in groups. For instance, this particular read is set up to deal with industrial properties of approximately 400,000 square feet, give or take 100,000, that are fully leased to Class A tenants. A developer will build an industrial park to those sort of terms. When it's complete and he wants to cash it out, he will sell it to a real estate investment trust. But the sale, as the witness has testified, is typically based upon the lease fee transactions, and it's an investment type sale. It's not a sale of the real estate per se. It's a sale of the income that's coming out of the real estate. That's the basis for a lease fee transaction. It's not a typical buyer-seller in the market. But it can be indicative of market value. It can be, yes. However, here our review appraiser, Mr. Eusenbach, talked to one of the parties to the transaction. I believe it was sales 2, 3, and 5. And that particular person told him that this was a bulk transaction with allocated values of the lease fee interest in the property, not a fee simple interest in the property. And yet PTAP saw fit to either ignore or give little weight to actual fee simple sales that were 30 miles or less from the subject property. Well, isn't it within PTAP's discretion to place more weight on Gibbons and McCormick's testimony versus Eusenbach's or whatever his name is? If the review appraiser hadn't testified, I would say yes or perhaps yes. However, in this case, the review appraiser testified. He teaches this stuff for the Appraisal Institute. He examined the appraisal. He talked to at least one of the parties to the transactions that we just talked about here. And in his opinion, these properties don't meet the lease fee transactions and not fee simple transactions. Yet PTAP chose to wholly ignore that. I know no grounds that I've read in their decision anywhere other than it didn't seem to fit with where we wanted to go. It seems like the first part of your argument, you were basically arguing to the fact finder as to why Eusenbach should be believed. The fact finder doesn't have to believe Eusenbach. That's correct. He doesn't have to give a reason for it. And I'm not arguing that he has to accept them. However, there is nothing in the record to indicate nor were we given a reason in the opinion why Mr. Eusenbach's testimony was not credible. I cross, there were only several questions I cross directed to his testimony. His testimony was basically uncontradicted. And yet it was excluded from the decision. For all those reasons, I believe that we, and I'd like to get to the court, the Kentucky County of the Armstrong case, which says whether the determination of the appraisal is at issue, it calls for a de nobis reveal. That case is distinguished. Well, the facts of that case are distinguished. The facts of that case... That property was old. It was unique. It was hard to find comparables. That's no different than the subject property as to age. This one is large. It's 860,000 square feet. There aren't a lot of buyers out there, and it's unlikely that somebody from Aurora is going to walk in and say, I want your building if you put it on the market. Instead, you're going to market it, as Mr. McCormick testified, to the entire Chicagoland area because somebody who needs an 860,000 square foot building is going to come from beyond just Aurora. Any further questions? Thank you, Counselor. We'll have time for a bottle of idea. Mr. Witt. May it please the Court, my name is Joshua Witt, and I represent the City of Aurora and the West Aurora School District in this matter. Kraft asked this Court to reverse the PTAB's decision as a matter of law, however, for a failure to follow proper methodology. However, Kraft's claim of inappropriate methodology simply has no basis. In determining the taxable value of this property, the PTAB considered the sales comparison approach, the cost approach, and the income approach. These are the three traditional methods of valuing property. Was Usemak's testimony contradicted in any way by any of the other witnesses? Usemak came in to testify after Gibbons, and he was reviewing Gibbons, so it was him versus Gibbons. Do you agree with Counsel that the PTAB either had to take McCormick's bottom line, I think the value of 30 or Gibbons, 43.3, and could not arrive at a different figure? Absolutely not. That's the first time I've heard that. The PTAB is required by its rules to make a decision based upon equity in the weight of the evidence. What Kraft is suggesting is that the PTAB has to look at all of one party's evidence or all of the other party's evidence and pick one or the other. I mean, there are individual opinions in each of these appraisals that are supported by different levels of evidence. The PTAB, in a number of decisions, the PTAB looks at the opinions and says, I agree with this opinion, I don't agree with that opinion. I mean, not the entire appraisal. I don't know of any situation where, except maybe baseball arbitration, where it's one or the other. There are a number of opinions that go into an appraisal, and I think it's up to the PTAB to weigh those opinions and make a determination. So you don't think that it's unusual to come up with this third approach that came up with different numbers than any of the experts came up with? No, not at all. How do you distinguish the case Armstrong? The Armstrong case? That case was a different property. It was an unusual property. They talked about in there how it had a vertical manufacturing process. I'm not really familiar with the property, but it sounds like unique property. Is any of this case unique property because of the sheer size? The record reflects that all the parties agreed that it was not unique. I mean, it's just a large box building. Because of its size doesn't make it unique. You drive around, you see a lot of these large boxes. In the Aurora area? Yes, in that area, in that general area that this property is in. There's a toilet plant there. There's a number of large boxes in that area. Up and down Delta Road where the Liberty properties were located, a lot of large boxes just in one street in Aurora. The Armstrong case, in that case the Board of Review presented sales of leased properties. However, the expert presenting the leases, presenting those sales, had no information with regard to the leases in place at the time of sale. Therefore, he could not have made a determination of whether it was a leased fee sale or a fee simple sale. As Justice Burke asked him, his appraiser even testified. It's a general appraisal practice. If a property is leased at the time of sale, you have to look at the leases in place. If the leases are at market, it's a market value transaction. If the leases are above market, then you have to adjust the sale down to reflect market. If the leases are below market, you have to adjust the leases up. What Kraft is asking here is essentially for this Court to say that a property, in order for it to be a comparable sale, the property has to be vacant. Because the leases in place for the three comparables of givens that they used were all found to be at or near market. So in order to throw those sales out, this Court has to find that a property that is leased cannot be indicative of market value. Just recently, it was announced that Geneva Commons Mall was selling for $120 million. What Kraft is suggesting, though, is in order to find comparable sales for Geneva Commons, you couldn't use that sale because there's clearly leases in place. You would have to find a similar property that was completely vacant at the time of sale and use that as comparable. Obviously, that's going to drive down the values. I mean, the fact that properties are sitting vacant is more indicative of, could be indicative of the condition of the property, could be indicative of the location of the property. This property is not vacant. The properties in the area are not vacant. The PTAB found that an 8% vacancy rate was appropriate. There was not a large vacancy problem. But how can you justify the PTAB excluding simple property sales that were 25 to 30 miles away? They excluded them based on their location. I think one of the main considerations probably was the proximity to the interstate. But you don't know that because there was not really that much testimony with respect to the proximity to the interstate. There was some testimony of the greater proximity to the interstate. There was a map showing where it was. Inferior location, I think is what they said. Yeah. But how about what Mr. Dewey states is that this is a warehouse, if you will. It's not that people are going to be going there for the schools or… It's not with the people working there. It's for the transportation of trucks in and out of there. So you're putting more weight on that. It's used for a distribution warehouse, yes. I mean, these buildings have, and I can't remember off the top of my head exactly the number of loading docks this building has, and it has a large parking lot for trailers to park. I mean, it's a distribution. And it's, you know, trucks coming in and trucks going out. So regardless of where these other factories or warehouses are located, the market value or real estate value in those areas is not as important as loading docks, access to the highways? Is that what you're saying? No, I'm saying that… Because that's not what you were arguing. The interstate, the issue of the location of these properties and the proximity to an interstate has more to do with the ability for the property to operate as a distribution center with trucks coming in and coming out. And the properties that are farther away from the interstate are less desirable because the trucks have to travel farther, some roads they can't travel on in order to get to the property, so that poses a problem. Can you comment on counsel's argument that the… I think everybody agrees that the sales comparable comparison approach is the best, but the other approaches usually bolster that. But in this case, they didn't. They didn't. I believe the PTAB found…the PTAB considered all three approaches to value. They found under the income approach that the property had a fair market value, and I want to get the exact number, probably 40… 40.9. 40.9. And then under the cost approach, it was 34 million. And then under the sales comparison approach, it was 39.6 million. And those findings under the cost approach and the income approach are not being challenged. So the PTAB considered all three of the approaches and reached its decision at $40 million. But they kind of mixed… Yes. …in order to arrive at that. They looked at the individual opinions of the appraisers in the appraisals and evaluated those opinions on an individual basis. What they're suggesting is that the PTAB could not do that. So they'd have to pick what appraiser is better than the other. So if one appraiser, you know, had a mistake or had an assumption that the PTAB did not agree with in its income approach, however, liked its comparable sales, the PTAB would have to ignore the income approach mistake and say that appraisal is better than the other appraisal. When you're mixing them like that, aren't you getting an inconsistent or not a true value? No. I mean, there are, you know, in the cost approach, the PTAB looked at it and said, okay, first of all, we have to look at the replacement, what it would cost to build it. And they said that both experts were pretty close on, almost identical in terms of what it would cost. Then you have to determine depreciation. They found that the crafts appraiser had a better deduction for depreciation, so they used that.  And then in the income approach, they looked at our rental comparables. They looked at their rental comparables and determined we were at $4, they were at $3.75, and they concluded at $3.75. I mean, you're looking at, you're essentially taking and looking at it as one big appraisal because there's, you know, evidence for each of the assumptions that are made. Thank you. Ms. Quinn, you may proceed. Thank you. Good morning. May it please the Court. PTAB did not exclude the properties that were further away. It simply gave them less weight, but it considered all of the properties, all of the sales comparison properties that were placed before it. I would also like to address up front Kraft's argument about improperly selecting the Chinese menu approach. This Court's prior decision in the Kendall County case involving the AT&T Telecom Center that was underground pretty much answers that because there, as here, the PTAB, while the appellant claimed the PTAB had used improper methods by selecting portions of each expert's appraisal that it felt were best supported and were most credible, and there, as here, the PTAB came up with a number that neither party had asked for. It was a completely different number. And this Court affirmed that decision. The PTAB was not constructing its own appraisal there. It was simply carrying out its proper function as a fact finder and determining what evidence was and was not worthy of belief. This property is big, but it is not unique. And we have the testimony of both Mr. Gibbons and Mr. Uzumak to that effect. And Mr. Gibbons testified it would be relatively simple. This is a very nice one-story warehouse, that it would be relatively simple to put in some dividing walls in the interior and make it multi-tenant if you had to do that. And that testimony is at record 30 at manuscript 117-18. And both he and Mr. Uzumak agreed that this isn't unique, and his testimony is at record 33, manuscript 130-131. Mr. Uzumak testified to that effect at record 40, manuscript 159. I don't want to bore the Court with cites, but this is your classic war of the experts. And it fell to the PTAB to decide whom to believe and which parts of which appraisal to credit. So since they're crediting the testimony of the witnesses, what's our standard of review? The standard review is the PTAB's decision against the manifest weight of the evidence, which means that you'd have to conclude that no rational fact finder could have come down where the PTAB came down. And, you know, obviously the Court has read the record in some detail. Over and over throughout this appeal, Kraft has claimed an issue of methodology when it's really a matter of conflicting evidence. Is there a difference between leased fee transactions and fee simple transactions? Leased fee means the property is rented and there's a tenant in place. But as long as the rent is at market value, you may consider these fee properties as if they were fee simple properties, which makes sense. And this is one of the reasons the expert in the Armstrong case was rejected because not only did he offer comparables that weren't really comparable, but he tried to testify that being leased has no effect on a property's value. It does. Businesses are rational actors. If the rent is at market, no buyer is going to pay a price that's inflated relative to the income stream that he can expect, and no seller is going to let go of a market-level income-producing property at a below-market price. So it gives you an idea of what the fair cash value on the open market would be. Again, throughout the record we have examples of conflicting evidence. For example, Kraft claims that Gibbons' Sale 5, which the board found pretty probative because it was almost as big as the subject property, was never listed on the market, and thereby implying that this was not an arm's-length transaction. And its support for that argument is E-243, which is the addendum page to Mr. Uzumak's rebuttal report. And that report states, reportedly, the property was not on the market at the time of sale. That's sort of like a rumor hazard. And then the counterpoint to that is Mr. Gibbons' appraisal, which explicitly states that all the sales comparables he used were arm's-length cash or equivalent transactions. That's at E-187, which is part of his appraisal. And at E-183, he tells us he spoke to Sale 5, listing broker Roy Splansky, to confirm the details of that sale. You don't need a listing broker if you haven't put your property on the market. Over and over, it all comes down to conflicting evidence. And it was the Property Tax Appeal Board's job to sort through that. Its decision was reasonable. It was well supported on this record. And unless the court has further questions for me, I would ask that the decision be affirmed. Thank you, counsel. Mr. Doody, rebuttal argument, please. And when you start, maybe you could begin by addressing Ms. Quinn's cite to the Kendall County case in response to your argument. I didn't bring it. I don't have the Kendall County case with me, Your Honor, so I can't address it at this point. In reply to the arguments, particularly to Mr. Witt's argument, he stated that if there is one big appraisal, it's an appraisal that PTAB created. That's essentially our argument, that PTAB created its own appraisal. It did pick and choose. When it selected and it chose, it made errors. Those are errors which call for a de novo review of the subject of the PTAB. Is it an error just to pick and choose? Or are you saying the error was there were errors made in the picking and choosing? Or are you saying it's error to pick and choose? I'm saying, absent a sound reason to pick and choose, PTAB needs to weigh the testimony of the experts, which would almost inevitably lead it to choose one appraisal over another appraisal. Case law, I mean, we're not talking about property and taxes and things like that, but case law in other areas, divorce is a great example, shows where courts don't have to do that. Courts is a fact finder. I don't know how many divorce cases this panel has probably heard where you have an appraisal of a business where it's one person running the business, a doctor, a dentist, whatever, and one appraisal comes in and says it's worth zero without this person, and another one comes in and says it's worth a million dollars. So you have a trial court who's sitting there going, well, I've either got to go a million or zero. Well, most of the time trial courts say, no, it's worth something somewhere in between. And as long as there's a basis in the evidence by which to place that number, those cases have been affirmed. So why is PTAB different than a court of law sitting as a fact finder? Well, one of the main differences is PTAB is an administrative agency. It's granted only the power and authority that the legislature gave it and that its rules grant it to do, whereas the authority of a trial judge is far broader. Yes, a trial judge can, and I know my personal experience, they frequently do, particularly in our count of nation cases. They split the difference between the two. Do they use a mix-and-match approach when they do that typically? Typically, no. They come up with a value. Here's the value we believe is correct. So the difference between a divorce case and what this case is you're submitting is there's no mix-and-match approach there. In a divorce case, there may be, but it's not spoken. It's not committed. It doesn't show up in the court's decision. It simply says we've listened to the witnesses and the experts, and we believe the proper value to be X. But you're not submitting that it's improper to mix-and-match, are you? What I am submitting to the court is that it's improper to mix-and-match unless you have a sound reason to do so, and typically that would almost have to be an appraisal reason. PTAP is not an appraisal agency. Their area of expertise is hearing cases and weighing the evidence. When they start developing their own opinion of value, their own methodology should be called into question. We should be able at some point to say to some level above them, hey, they got a value that we never were able to review or cross-examine. When you look at it, here's how they got there, and here's the mistakes they made. So would you be arguing any differently if they took one approach and came up with a different amount based upon that one approach? Would you still be arguing as you're arguing here today? Then I think it would fall into the manifest way to the evidence standard as opposed to a de novo standard. Is there any case law that you found out there that precludes PTAP or anyone from using a mixed match approach? None that we were able to uncover, Your Honor. Is there anything in the rules that you refer to that prohibits that? No, it's more in the absence. There's nothing in the rules that give them the right to. And since they are an administrative agency, their power is only that which is given to them. They're typically not permitted to go beyond that. But what are they supposed to do? What do the rules say they're supposed to do? What is their job? They're supposed to hear the testimony, weigh the evidence based upon it, and issue a decision based upon equity and the weight of the evidence. We don't believe that they did that in this case. Thank you. Thanks, Court, for this time. Thank you very much. We would like to thank the attorneys for their arguments in this case. The case will be taken under advisement, and we are adjourned.